FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2013 JUN 12 AM 9: 09

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

## COMPLAINT

1. Mr. Allen holds the Boulder Shelter for the Homeless  in Direct Violation of the Americans with Disabilities Act Title III Regulations .

2. Part 36 Nondiscrimination on the Basis of Disability in Public Accommodations  and Commercial Facilities . Subpart C - 36.303 Auxillary Aids and Services - (c) Effective Communication .

3. Staff on Duty Chad Molter never asked Mr. Jeffery Thomas Allen if He Had any Contraband to turn in . Staff on Duty Chad Molter was to preoccupied with Intoxicated Resident Jennifer Parr . Whom should have not been on the scene at the time of Mr. Allens Intake in the first place and whom should have definately not been allowed to interfere with Mr. Jeffery Allen during the check in process.

4. Mr. Allen had made it plainly aware to Val Ball at His intake appointment that He was Severly Head Injured , and that He was concerned about possibly accidentally carrying in Contraband .

5. If Val Ball had not made Staff on Duty Chad Molter aware of this fact , Mr. Allen is sorry but He should not have been held accountable for their failure in communication .

6. If Mr. Allen cannot count on the People that He would believe to be in a Position of trust to be aware of the situation that He is in after He makes them plainly knowledgeable on the fact . Then what is Mr. Allen supposed to do . It becomes a crap shoot and at this time Mr. Allen was extremely Ill and He could not

1

13-CV-01475

afford to lose .

7. Yes the Boulder Shelter for the Homeless does have signs . Two small signs that Mr. Allen is aware of , and He can tell You right where they are , at 10:00 P.M. the lights had been shut off so even if Intoxicated Resident Jennifer Parr had not been there creating havoc Mr. Allen would doubtfully ever have seen the signs anyway .

8. Mr. Allens Intake case Manager Val Ball on June 22nd at His second Intake Appointment to see if He would be accepted back into the program[like He had done this on purpose] told Mr. Allen that if He had come in through the front door every night He would have heard Staff yell out to turn in all Alcohol , Tools and Weapons at the Front Desk . Mr. Allen is sorry He had not come in through the front Door for over 30 days ,  and then only perhaps once or twice . Regardless , Mr. Jeffery T. Allen upon the Knowledge that insufficient Auxillary Aids were in place to meet His Uniqe needs at that time , and with the In terference of Jennifer Parr at Mr. Allens intake Mr. Allen should have been givin the benefit of the doubt and not thrown out to Die .

9. Val Ball then began to tell Mr. Allen another story . She once had a Client and He was on Parole . He violated Parole and got sent back to Jail . As Staff was cleaning out His locker they found a Leatherman [a little multi tool with a knife blade on it] and they had to kick Him out for 90 days . And then Val Ball looked at Mr. Allen like He should feel lucky . And all the time Mr. Allen is thinking that , well , He was on Parole , Im not , He has a record to some extent , I dont . He should not have had it in His possession anyway , Im allowed outside of here . He was intentionally hiding it from You , I didnt . He was lying to You about having it , I wasnt . And Mr. Allen was sure that the same mitigating factors were not taking place at the time of His infraction .

10. Mr. Allen began to believe at that moment that they were either trying to get Him to go away or Die because they realized they Had made a grievous error .

11. Mr. Allen looking very hagard and beaten and not in complete mental awareness , suffering severely from Cerebral Hypoxia left that meeting not knowing when He would be accepted back into their Program . If in fact He would be .

12. The Boulder Shelter for the Homeless violated The Americans with Disabilities Act Title III Regulations .

13. Part 36 Nondiscrimination on the Basis of Disibility in Public Accommodations and Commercial Facilities . Subpart C , 36.303 , (A) General . And (C) Effective Communication .

14. I am sorry it is them .

15. I am sorry it is now .

16. I am sorry it is here .

17. This is where I make My stand .

18. If Mr. Allen is going to be punished so harshly , to the point of Death , for situations He cannot control . A Metal Detector is needed upon entry , and not just for Himself , but to stop all the bad People .

Mr. Allen is not a legal Scholar . Mr. Allen pleads to the Court that He be appionted Legal Representation .

Mr. Allen is at a severe financial disadvantage in this situation to bring this before You is taking every penny Mr. Allen

3

has .

JEFFERY THOMAS ALLEN

6-11-2013

# COMPLAINT

1.    Mr. Allen submitts to you the fact that upon the the night of June 8th 2011 Mr. Allens Eviction from the Boulder Shelter for the Homeless was Illegal and no regard was givin to the Law or the Rule of Law that is in place to protect Mr. Allen from just such actions .

2.    Mr. Allen was Extremely Ill at the time that this took place and He could not physically handle being thrown out on the streets .

3.  The Americans with Diabilities Act Title III Regulations , Part 36 Nondescrimination on the Basis of Disability in Public Accommodations and Commercial Facilities , Subpart B , Section 36.208 Direct Threat states that Mr. Allen must be judged on an entirely Individualized Assessment .

4.    An Individualized assessment was never granted . none of the rights that are in place to protect Mr. Allen were heeded . Mr. Allen was thrown out on the streets to Die .

5.    Mr. Allen believes it to have been Cruel and Heinous .

6.    Mr. Allen believes it to have been Extremely Reckless , possibly Wanton Endangerment .

7.    Mr. Allen believes it to have been Aggravated .

8.    Mr. Allen believes it to have been Cruel and Heinous Wanton Torture , Aggravated . Performed by a group of people that Mr. Allen would consider to be in the Position of Trust .

1

13-CV-01475

9.     What was the Boulder Shelters Assessment . I am sorry "Reflection" does not answer my question .

10.     Mr. Allen cannot understand why there was a two day delay in His Eviction if regardless of anything His Eviction was immenent . They [the shelter] were not taking heed to the Law that is plain .

11.     Mr. Allen is sorry but He cannot accept the fact of someones recklessness and irrationality almost cost Mr. Allen His Life .

12.     No one at the Boulder Shelter For the Homeless is of the Educational or Experience Level to pass a judgement on Mr. Allen . Mr. Allen is of an absolutely Uniqe situation in His Disability .

13.a.    Mr. Allen was givin no Individualized Assessment .

    b.    The Reasonable Judgement would have been Mr. Allen is a nice guy and He never would have done this on purpose it was exactly what He said it was. A Totally and Completely Unconcious Accident . We might need to check our procedures at Intake to make sure this never happens again . We might want to consider an Auxillary Aid for just these types of situations . Alot of seriously Brain Injured Veterans are returning home .

    c.    Staff on duty Chad Molter did You ask Mr. Allen if He had anything to turn in . Staff on Duty Chad Molter was Jennifer Parr at the front desk creating chaos upon Her Eviction for breaking the Shelters alcohol policy . Staff On Duty Chad Molter were You aware that Mr. Jeffery Allen is brain Injured . Did You know that Mr. Allen was on oxygen . If You held this knowledge why did refrain from making it common knowledge to the people that told You to Evict Mr. Allen , or did they not care . Staff on Duty Chad Molter how many times had Jennifer Parr been Evicted for Violating the Boulder Shelter for the Homeless Alcohol Policy . What were Her Punishments . Was Jennifer Parr Being Evicted for violating the Shelters Alcohol Policy the night that Jeffery Allen passed the front desk with the

2

Pocketknife . What time of the night had Jennifer Parr entered the Shelter . What time of the night had Jennifer Parr failed the Breathalyzer . What time of the night did She exit the Building after Her Eviction . Was She present and causing a significant problem during Mr. Allens Intake . Did Mr. Allen turn in the pocketknife immediately upon discovery . How Long had Mr. Allen been in the Building . What time of Year was it . Was the Shelter opened or closed for the season . was anyone around . Did Mr. Allen tell You that He was sorry He was Brain Injured . Did You know prior to this point  . At what point did You know that Mr. Allen was Bain Injured . Had Mr. Allen had any kind of incidences with Staff to this point .

     d.    Val Ball were You aware that Mr. Allen was Brain Injured . Had Mr. Allen made this information plainly aware to You . Had Mr. Allen brought up His concerns over this particular rule telling You that He had short term Memory situations and that He might absent mindedly bring something in . Did You make the other Case Managers aware of the situation with Mr. Allen . What was their perception of the situation with Mr. Allen . Were You aware that Mr. Allen was on oxygen . Were the other Case Managers aware that Mr. Allen was on oxygen . When did You become aware that Mr. Allen had been Evicted . Did You play any Role in that Eviction . Did You make Staff aware that Mr. Allen was severely head injured . Did You make Staff aware that Mr. Allen had shown concerns over this rule . Did Mr. Allen ask you for an Auxillary Aid . Did You offer Mr. Allen an Auxillary Aid . Was Your Perception of Mr. Allen such that You did not believe Him to need an Auxillary Aid . What were the other Case Managers thought on Him needing an Auxillary Aid . Was Mr. Allen a nice guy . Had Mr. Allen had any incidences with staff to this point . Did You know that Mr. Allen was Extremely Ill and just prior had been worse

14.    Mr. Allen could go on for a long while . Mr. Allen believes these questions to be Pertinent and Mr. Allen has many more . For many more People .

15    These are the People that claim an active involvement in Mr. Allens Eviction

16.      Ren'e Brodeur , Director of Programs . Andrea , Assistant Director of Programs . Primary Staff Chris G. , Supervisor . Support Staff Chad M. , Lead Staff . Greg Harms , Executive Director .

17.      All of these People willfully and Grossly violated Mr. Jeffery Thomas Allens Rights . Mr. Allen feels He deserves to be made Whole .

18   Americans with Disabilities Act Title III Regulations ; Part 36 Nondiscrimination on the Basis of Disability in Public Accommodations and Commercial Facilities ; Subpart B - Direct Threat .

19.      Mr. Allen never had a Chance .

20.      If they had no plan B for Mr. Allen who had innocently made a mistake well within the scope of His Disability . And then on Good Faith tried to correct His error . Well then what is Mr. Allen supposed to do . Mr. Allen believes this situation to have been Directly Discriminatory  and Directly Biased to Him and His Uniqe Disability and the failure of the Boulder Shelter for the Homeless to apply the Rights granted to Jeffery t. Allen for the Life detriment that He lives with everyday is Heinous .

21.      Mr. Allen believes that if a Reasonable Mind had been involved in the Assessment that should have taken place surrounding Mr. Allens Infraction He surely would have been Vindicated .

22.      I am sorry its them .

23.      I am sorry its here .

24.      I am sorry its now .

25.      I was Tortured and abused to the Point of Death and I am making My Stand Now , the only way I know how .

Mr. Allen is not a Legal Scholar .

Mr. Allen calls on the Court to Please grant Him

Legal Counsel .

Mr. Allen is Financially disadvantaged . To bring

this before You is taking every penny Mr. Allen

has .

JEFFERY THOMAS ALLEN

06-11-2013

5

Events Leading up to and Including

Jeffery T. Allens

April 14th 2011 Intake Appointment

Mr. Allen had been released from Exempla/Good Sammaritan Hospital on December 6th 2010 .

He had been Hospitalized November 23rd 2010 after suffering Heart failure and Respiratory failure and being rushed to the Hospital .

He had asked the Patient Advocate to find Him someplace to go when He was released from the Hospital . He could not go back to the place He had been residing , it was not a good situation for Him from the standpoint of health .

Many factors were involved in the situation . The people He lived with were thieves . They were taking advantage of Him and the situation He was in with His Illness .

He was sleeping alot and He could not keep an eye on His possessions .

He was paying the significant portion of the rent even though there were two of them . He was resigned to a small bedroom . He could not cook due to their filthy habits .

Mr. Allen was paying most of the rent and they were still constantly trying to

1

13 - CV - 01475

sponge Him for money .

Mr. Allen now had an enlarged Heart . He was still very Ill , He had just suffered Heart failure and He did not think He could handle the stress of that living situation .

Mr. Allen wanted the Patient Advocate to find a Nursing Home for Him to go to .

The Patient Advocate said that She could not find one that Mr. Allen could afford .

Mr. Allen asked the Advocate if She could find a Homeless Shelter for Him to go to .

The Patient Advocate told Him that She could not find one that could accomo date Him and His oxygen machine . The best thing Mr. Allen could do at the moment was stay were He was and try to make do .

Mr. Allen returned to His place of  Residence and began to convalesce .

During His convalescence Mr. Allen remembered the Boulder Shelter for the Homeless and having stayed there around 20 years ago remembered that they had a Transitional Program that may give Him away out of His current living situation .

Mr. Allen called the Boulder Shelter for the Homeless to see what information He could gain on the Program .

Mr. Allen told the shelter the situation He was in , He was on disability , He was on disability for a Brain injury , He was on 24hr oxygen , could they accomodate His Machine .

They told Him that He could not stay in 24hrs . That He would have to leave everyday between the hours of 8 a.m. and 5 p.m. .

Mr. Allen said that was okay if they could accomodate His oxygen machine so

2

He could fill up His tanks .

They said that they could .

Mr. Allen asked them if they would accept His disability as His proof of consistant income .

The Staff member Mr. Allen talked to that day was Robbie and Robbie told Mr. Allen yes .

Robbie told Mr. Allen that He would first have to get an intake appointment and that Mr. Allen would have to call everyday starting at 4:45 p.m. to try and get one

.

It was on a first come first serve basis and the appointments went fast . Call everyday , possibly at 4:30 p.m. to try and secure one .

Mr. Allen asked if there were any available now .

Robbie told Mr. Allen no .

This was sometime in the middle of March 2011 .

Mr. Allen began to call fervently every day .Sometimes multiple times per day . beginning at 4:30 .

It was Mr Allens way out of the situation He was in . It was a chance for Mr. Allen to recover from this Grievous Illness .

Mr. Allen made it absolutely and perfectly clear to every staff member He spoke with when He called in for an appointment that He was Head Injured and on 24hr oxygen .

Mr. Allen was more explanative to some than others , Staff member Robbie and now Case Manager former Staff Member Karen , but all Staff that spoke with

3

Mr. Jeffery Thomas Allen were aware of His Oganically Anatomical situation and that He was on 24hr oxygen .

Mr. Allen secured an intake appointment on or about the 1st of April 2011 and that appointment was set to take place on the14th of April 2011 . The case Manager at that intake appointment would be Val .

Mr. Allen continued to call daily to make sure He had the time and date right .

On April 14 2011 Mr. Jeffery Allen met with Val a Case Manager at the Boulder Shelter for the Homeless to discuss His situation and see if He would be accepted into the First Step of the Transitional Program that the Shelter operated .

Mr. Allen oxygen tank in tow began to explain to Val His situation .

Mr. Allen told Val He had to get out of His living situation . The theft . His grievous Illness . How severely Ill He Had been just a short time ago .

"He wasnt wishing to leave because He couldnt pay the rent . He needed to leave because He couldnt handle the stress of the conditions He was living under".

Val asked Mr. Allen if He had a consistant form of income .

Mr. Allen told Her that He did and He produced His 2011 S.S.D.I. award letter .

Val then asked what He was on Disability for .

Mr. Allen told Val that He was on S.S.D.I. for a Severe Traumatic Bain Injury that had occured when He was 17 years old . He was severely injured in a Car accident . He Had been on S.S.I. some 23 years ago but He did not get enough to survive . So He left it .

He went out to work as a Laborer . Never really seeming to make it anywhere as far as advancement was concerned . His disability always seemed to get in the way in many instances . As far as short term memory goes , if He left out a tool

the people He was around or Employed by acted as though the sky was falling .

With His speech Dysarthia they often times thought He was a retard or with His slurring of speech , drunk . Mr. Allen stutters and pronounces words wrong much , much more often than what we know to be normal and as of that of an Organically and Anatomically correct Individual .

About every 50 to 100 steps Mr. Allen will uncontrollably drag His right foot .

Mr. Allen was not bonk on the head injured . He had actually had part of His brain removed . And there are significant Anotomical situations that are a result of His severe Injuries .

"I dont know how I came out as good as I did I guess God was on my side" .

Mr. Allen and Intake Case Manager Val went over the conditions of stay that you must abide by to remain a Resident in the Boulder Shelter for the Homeless Transitional Program .

For the most part they were gone through quickly . Mr. Allen is a disciplined drinker and would never under the rules of the shelter . He is clean . Mr. Allen is not lazy and His chore would be done .

Mr. Allen is an amiable , gracious , responsible and rational individual . A general Good Guy that wants to fly the right way . He has no prior Criminal Involvement of any sort and He sees no problem of any sort with what the shelter expects out of Him .

Mr. Allen stopped upon the rule that says that you must turn in all weapons and tools that can be used as weapons .

Mr. Allen told Intake Case Manager Val that He had a problem here . That of course He wanted to abide by the rule but the absolute fact of the matter was that He had worked in the constuction field all of His life . Screwdrivers , pocket knives , files and all sorts of other indiscriminate little tools would wind up in His pockets .

5

He wouldnt even realize it then He would forget about them .

Mr. Allen was significantly Head Injured and one problem that He has is short term memory . things usually come back a short time later . In a manner of speaking some things stick better than others . Mr. Allen is constantly checking His actions to make sure that the most important things such as debit cards ,  car keys and His wallet do not get left behind or bills get out of control .

It wouldnt be on purpose and He would mitigate the situation as soon as He realized it . But it is a reality . He comes in contact with items of that nature all the time .

Mr. Allen asked Intake Case Manager Val how serious Staff were on this situation ,  if He accidentally forgot and brought in something that would be considered contraband . And its not limited to something that could be considered a tool or a weapon . It could be anything .

Intake Case Manager Val told Mr. Allen "pretty serious".

Mr. Allen said "I really dont have to go anywhere", and thinking about it for a second chose to sign the Boulder Shelter for the the Homeless Conditions of Stay believing that a situation of trust had been reached with a person He believed to be in a position of trust and as long as He came forward immediately and did the right thing , in good faith . His good Conduct with the Shelter , His Anatomical Medical situation , and the grievous Medical situation He was now in would all be taken into consideration and it would be reallized that it was an absolutely unconcious accident .

If of course any accident at all was to take place , Mr. Allen is very good at making His disabilities seem less than they actually are . Mr. Allen has worked very hard at rehabilitation , He realizes His shortcomings , and He tries very hard to keep track of them and mitigate any situation before it gets out of hand .

6

Mr. Allen works very hard .

Mr. Allen asked Intake Case Manager Val what happened next and He was told that His situation and information would be brought up at the next Case Managers meeting in a couple of days and his acceptance would be decided on then .

She then said to Mr. Allen "I dont think your dangerous", and at that point Mr. Allens Intake Interview to become a resident in the Transitional Program at the Boulder Shelter for the Homeless ended .

Mr. Allen was accepted into the Program and assumed residence at the Boulder Shelter the 24th of April 2011 . For 45 days his attitude and His performance , within the Shelters scope of conditions , was stellar .

JEFFERY T. ALLEN

06-11-2013

This is the Shelters version of the Incident that took place

06/06/2011-06/08/2011

It took Me 5 months to get this Incident Report from them

1

13-CV-01475

# Boulder Homeless Shelter

07/11/2011, 02:33 pm

**Incident Report**

Page: 1 of 2

Incident Date:   06/08/2011
Primary Staff:   Chris G
Support Staff:   Chad M
Other Staff:                                          Sign:   _____

## 1. Residents Responsible

Resident

Jeff Allen

## 2. Other Residents Involved

Incident Type:   Violation of Condition of Stay

Condition Violated:   Weapons

### 3. Incident (Describe)

Jeff Allen checked in at approximately 10pm and when he got to dorm supply he realized that he had not turned in his knife and did so. At the time staff did not see this as a safety concern because so little time had elapsed between the time that Jeff checked in and turned in the knife. Upon further reflection we decided that because Jeff left the intake area and entered the Shelter he should be given a 14-night consequence for voluntary late major weopon turn in.

### 4. Consequences Given

Number of nights out:   14

☐ Discussion at Staff Meeting?           ☐ Denied for Services?
☐ Resident notified at conflict?           ☐ Meeting with Director?
☐ LTD?

### 5. Other Factors

☐ Resident Intoxicated?

Other Substances:

☐ Law Enforcement Called?
☐ Mental Health related incident?
☐ Medical Incident?

### 6. Volunteers

☐ Volunteer(s) Involved?

Volunteer Involvement:

☐ Volunteer needs Debriefing?
☐ Volunteer Coordinator follow up necessary?

### 7. Law Enforcement

Time call went in:

Names of responding officer(s):

Responding Type:

Additional Information:

### 8. Mental Health Crisis

☐ Mental Health Crisis Called?           Crisis Worker Name:
☐ Mental Health Counselor involved?      Counselor Name:

Situation outcome/status (or recommendations by crisis or MH counselor):

### 9. Medical Incident

Boulder Shelter for the Homeless

Response to Request for Information

Charge Number: P20120006X

Colorado Civil Rights Division

SEP 1 6 2011

Denver, Colorado

1a. Mr. Allen entered the Boulder Shelter for the Homeless (the Shelter) on June 6th, 2011 at approximately 10:00pm, carrying a knife in his pocket. The Shelter requires all residents to turn in all weapons immediately upon entering the building. Mr. Allen was aware of this safety procedure: he signed two documents (Criteria for Transition Program dated 4/14/11 and Boulder Shelter Conditions of Stay dated 4/24/11) agreeing to turn in weapons upon entering the building. The knife Mr. Allen was carrying is large enough to be considered a "major weapon" by the Shelter. The Shelter's policy on residents voluntarily turning in a major weapon of this sort after entering the building is such that the resident cannot use shelter services for 14 days. This was the consequence bestowed on Mr. Allen.

1b. The Boulder Shelter for the Homeless is a 501(c)3 private non-profit providing safe shelter, food, support services, and an avenue to self-sufficiency for homeless adults in our community. Mr. Allen was enrolled in the Shelter's Transition Program. The goal of the Transition Program is for clients to have safe, temporary shelter; become more stable, and attain safe, sustainable housing upon exiting the program. To qualify for the Transition Program residents must agree to and abide by the rules as set forth in the Conditions of Stay at the Shelter, live alcohol and drug free, and have sustainable income.

1c. Employee making the business decision which is the basis of this complaint: René Brodeur, Director of Programs. The Shelter does not track protective class information on employees.

1d. Other employees involved in this decision: Andrea, Assistant Director of Programs; Chris, Supervisor; and Chad, Lead Staff; Greg Harms, Executive Director.

1e. Please see the included supporting documents:

- Signed Conditions of Stay for Mr. Allen
- Signed Criteria for the Transition Program
- Weapons policy
- Nightly stay history

2. Please see included list of employees.

3. Please see included written statements as provided by the Incident Report and letter to Mr. Allen.

4. Please see the following included documents relied upon for making the decision:

- Signed Conditions of Stay for Mr. Allen

This My version of the Incident

1

13-CV-01475

Events Taking Place the Night of June the 6th

And

Continuing into the Night of June 8th

2011

At short time before 10:00 p.m. on June 6th 2011  Jeffery T. Allen a 44 year old Male  arrived at the Boulder Shelter for the Homeless .

Mr. Allen had been in Denver that day cleaning out His storage .

The Late pass that Mr. Allen had recieved that Day was only good until 10:00 p.m. and being late is an offense that you will be evicted for .

Mr. Allen realized that He would not have time to go to His new storage in Boulder and unload his possessions so He decided to go directly to the shelter .

When Mr. Allen entered the Shelter staff on duty Chad M. was in the process of evicting resident Jennifer Parr for drinking alcohol .

Jennifer Parr was creating chaos during Mr. Allens check in . She kept harrassing staff on duty Chad M. over the use of the phone .

She pushed passed Mr. Allen while He was putting His tube onto the breathylyzer and went to the other side of the desk .

She began to push and throw the things Mr. Allen had sat there onto the floor .

While staff on duty Chad M. was trying to talk to her He reached out with the breathylyzer for Mr. Allen to blow . Mr. Allen did so and then began to gather His things .

1

Mr. Allen left the intake area down the hall to the Mens dorm where He threw His bags down on His bunk and then left the dorm on His way to the Back Desk/Dorm Supply Window to get His oxygen machine .

When Mr. Allen arrived at the Back Desk/Dorm Supply He came in contact with staff on duty Chris G.

As Mr. Allen was waiting in line He started noticing and taking account of the things He had in His pockets . Mr. Allen at first thought it was His cell phone but when He put His hand in His pocket He realized it was a pocket knife .

He immediately took it out , He was now first in line , and handed the pocket knife directly to staff on duty Chris G.

Staff on duty Chris G. pointed behind Mr. Allen and and said "Give it to Him" when Mr. Allen turned He came in contact with staff on duty Chad M. to whom Mr. Allen immediately handed the pocket knife to .

Mr. Allen was extremely apollegetic and was clearly remorseful . He told staff on duty Chad M. that He was Head injured and sometimes He did things like that . He had placed it in His pocket at His storage and had forgotten about it  when He ran in , then when He got in , the situation that Jennifer Parr was causing at the front desk , drew His attention totally and completely away .

Staff on duty Chad M. did not say anything as Mr. Allen followed Him towards the front desk . Mr. Allen stopped at the Nurses station to get His oxygen machine then returned to the hall . Staff on duty Chad M. was gone .

Mr. Allen rolled His oxygen machine to his bunk . Set up the machine and went to bed .

Nothing more was said that night .

The Day of the 7th of June 2011 passed uneventful and nothing was said of the incident . Mr. Allen completed His chore and left the Building failing to retrieve the

pocket knife that staff on duty Chad M. had taken to the front desk .

He had simply forgotten .

Mr. Allen returned to the shelter the evening of the 7th of June 2011, checked in , got Back Desk/Dorm Supply to let Him in to the Nurses Station , got His oxygen machine and went to bed .

On the morning of the 8th of June 2011 after the completion of his chore Mr. Allen remembered the pocketknife and went to the Back Desk/Dorm Supply to ask them if they would go to the front Desk with Him and get the pocketknife for Him as He left the Building for the Day . Staff on duty Lyndall/Resource Specialist and staff on duty Sarah/Kitchen Manager .

Sarah/kitchen manager accompanied Mr. Allen to the front desk . Mr Allen retrieved the pocketknife and immediately left the Building .

On the evening of June 8th 2011 shortly before 7:00 p.m. Mr. Allen returned to the Shelter for the night . As He was pulling into the parking lot staff on duty Chris G. and staff on duty Chad M. met Mr. Allen in the parking lot and told Mr. Allen they had to kick Him out for 14 Days .

Mr. Allen asked why and they told Him it was for the pocketknife that He had passed the front Desk with on the night of the 6th of June .

Mr. Allen told them He was sorry He had forgotten it in His pocket and with the commotion that Jennifer Parr was making it just absolutely slipped His mind . It was only for a moment and he turned it in as soon as He realized it .

They told Mr. Allen their hands were tied and they had to kick Him out . It was a rule .

Mr. Allen told them He knew it was a rule that is why He turned the pocketknife in as soon as He discovered it .

Staff did not care . They escorted Mr. Allen in to retrieve His breathing machine and clean out His locker . They told Him He was being kicked out for 14 Days . When He returned He would resume His number 1 position on the list to move from First Step up into the Transition Program .

Mr. Allen told them He was on 24 hr. oxygen . He did not have anywhere to go and at the the time He had no full Tanks .

Staff did not care .

Mr. Allen told them that if they kicked Him out for 14 Days it was going to kill Him . He told them that He was Severely Head Injured , it was an accident , no one got hurt . He was Disabled and He had rights .

Mr. Allen asked for an incident report .

Staff denied Mr. Allen

At that point Mr. Allen left the Building .

JEFFERY T. ALLEN

06-11-2013

4

Police Involvement

The Night of June 8th 2011

Mr. Allen realizing His situation , after being released from Exempla/Good Sammaritan Hospital just 6 months prior for suffering Respiratory Failure and Heart Failure was well aware of the consequences that could develop from His eviction from the Boulder Shelter .

Quickly Mr. Allen came to the conclusion that the eviction was Illegal they had taken into account none of the mitigating circumstances , they had not followed process of Law and they had not fulfilled any of the requirements that the Law requires to be fulfilled before they can evict in His case .

Mr. Allen decided to call the Police .

The responding Boulder Police Officer was Sgt. Doyle Thomas .

Mr Allen had told the Dispatcher exactly were He was waiting , at His vehicle , on the road behind the Shelter . He did want to go on Shelter property after eviction .Possibly considered tresspassing .

Possibly an hour later Sgt. Doyle Thomas responded to the scene .

Sgt. Doyle Thomas pulled off of Broadway and directly into the topless bar across the street and began driving up and down the lanes of spaces .

Mr. Allen tried to whistle and flash His lights but apparently did not catch the

1


13-CV-01475

attention of Sgt. Thomas .

When Sgt. Thomas started to leave Mr. Allen walked toward His car as fast as He could yelling as best as He could and waving His arms .

Sgt. Thomas must have seen Mr. Allen in His rear view mirror because He stopped and began to turn around .

As Sgt. Thomas drove up to Mr. Allen He turned on His floodlights and told Mr. Allen to empty His pockets , then He told Mr. Allen to lift up His shirt and turn around keeping His hands in view .

Mr. Allen complied and waited for Sgt. Thomas to approach Him .

When He got to Mr. Allen Sgt. Thomas told Him He could turn around .

Mr. Allen did so and began to tell Sgt. Thomas the story and give Him His information .

Mr. Allen told Sgt. Thomas He was Head Injured and on 24hr oxygen . Previously , 2 nights ago , He had passed the front desk with a pocket knife and they were kicking Him out now . He had nowhere to go , His Oxygen Tanks where empty , and it will put Him in Serious Peril if He is made to leave .

Mr. Allen told the Officer that He had turned it in as soon as He had realized He had it in His possession , moments after entering the Building .

Sgt. Doyle Thomas resonded " Two days ago " then laughed .

Then Sgt. Thomas asked Mr. Allen where the pocketknife was now .

Mr. Allen told Him told Him He did not know . Somewhere in His Vehicle .

At this time two other Officers arrived on scene .

Mr. Allen began to recite His story again , it was an absolutely and totally unconcious accident . He has never been in trouble with them before. He had

2

simply forgotten . A resident named Jennifer Parr was at the desk being evicted for Violating the Shelters Alcohol Policy , causing an excessive amount of commotion and chaos during His check in process .

" I am severly Head Injured and I do that , I made them {Boulder Shelter for the Homeless} aware that this may happen , I am sorry that it did happen , but I have no where else to go and I will Die if I have to leave " .

" I can not Physically handle being Kicked out for 14 Days with no access to My Oxygen ".

Sgt. Doyle Thomas said there was nothing He could do . He told Mr. Allen they { the shelter} were private and that they had the right to refuse service to anyone .

Mr. Allen told Sgt.Thomas they were breaking His Civil Rights .

Sgt. Doyle Thomas laughed .

Mr. Allen told Sgt. Thomas they where breaking His Civil Rights under the A.D.A.

Sgt. Doyle Thomas laughed again .

Sgt. Doyle Thomas then told Mr. Allen that He suggested He contact an Attorney if He felt this way , that there was nothing He could do .

They were a Private Bussiness and they could refuse service to anyone they wanted at anytime .

Mr. Allen asked Sgt. Doyle Thomas if there would be a report of this incident .

Sgt. Doyle Thomas told Mr. Allen no .

Sgt. Doyle Thomas told Mr. Allen that He was responsible for the report and He did not believe that this incident was serious enough to warrant a report .

Mr. Allen asked Sgt. Doyle Thomas if there would be a record that Mr. Allen

had made this call on this night .

Sgt. Doyle Thomas told Mr. Allen maybe .

Mr. Allen asked Sgt. Doyle Thomas for His card telling  Him that He needed it to ever prove this had taken place .

Sgt. Thomas handed Mr. Allen His card .

Mr. Allen turned to ask the one other Officer that remained at the immediate scene for Her card also .

Sgt. Doyle Thomas told Her not to give Her card to Mr.Allen , saying that " His would suffice ".

She stepped forward and handed Mr. Allen Her card .

Mr. Allen noticed that the third Officer had left the immediate scene and had gone to the door to  hear their rendition of the story

Slightly more may have been said but realizing that this situation was going to go nowhere Mr. Allen said okay and goodbye and began to walk back to His vehicle .

Shortly after Mr. Allen had arrived at his vehicle as He was taking assessment of His oxygen machine Sgt. Doyle Thomas and the other two Officers drove to where Mr. Allen was parked .

Mr. Allen saw them as they approached and had His proof of insurance and registration ready and was looking for His drivers liscense .

The young male Officer whom had gone to the shelter entrance to get staffs rendition of the situation approached Mr. Allen and asked Mr. Allen for His phone number telling Him that Andrea , Assisstant Director of Programs , would call Him tomorrow and let Him back in .

4

Mr. Allen did so and then the young Officer left back to the shelter entrance .

Sgt. Doyle Thomas was running Mr. Allens record , Mr. Allen always takes great care to do the right thing , and as anticipated , Mr. Allens record was clean .

At that time the young male Officer returned and told Mr. Allen that Andrea would call Him and let Him back in tomorrow .

Mr. Allen asked Sgt. Doyle Thomas were He could go to sleep .

Sgt. Doyle Thomas told Mr. Allen that He had to get out of town .

Mr. Allen once again asked Sgt. Doyle Thomas if there was going to be a report that He had made this call .

Sgt. Doyle Thomas seeming very irritated responded quite gruffly "MAYBE".

Boulder Police Depatment left the scene .

Mr. Allen prepared to go to Longmont and sleep .


JEFFERY T. ALLEN

06-11-2013

5



**Sergeant Doyle Thomas**
*Employee #0342*

**Boulder Police Department**

1805 33rd Street, Boulder, CO 80301
303-441-3479
thomasd@ci.boulder.co.us



**Boulder Police Department**
1805 33rd Street, Boulder, Colorado  80301
303-441-3300



**M. Patterson**
Officer
Employee #8217

**Boulder Police Department**

1805 33rd Street
Boulder, Colorado  80301
303-441-3315
pattersonm@bouldercolorado.gov

# Criteria for Transition Program

13 - CV - 01475

Client Name: _Jeff Allen_                    Date: _4/14/11_

# Criteria for Transition Program

Client and Case Manager need to review and sign these criteria. Failure to agree and follow these guidelines will result in the client being removed from the program.

1. The maximum length of stay is 9 months.
2. Remain current with all conditions of client contract.
3. Stay in each night at the shelter unless otherwise agreed upon with case manager.
4. Arrive at shelter each night by 7pm, unless you have permission from your CM to be out later, and can come in as early as 4:30pm daily.
5. Complete chore every day.
6. Pay a maximum weekly program fee of $25 or complete assigned service work hours.
7. Keep bed made neatly every day.
8. Launder bedding and towels at least once per week.
9. Keep good personal hygiene.
10. Maintain consistent income.
11. Have a clear budget and savings plan.
12. Meet weekly with case manager.
13. Follow basic rules of shelter and respect staff decisions (if you have questions see "Conditions of Stay")
14. Get along with other program residents.
15. Attend the Transition Program house meetings.
16. Maintain 100% sobriety and be drug-free while in the program, this includes not using alcohol or drugs while you are away from the shelter.
17. Leave the shelter by 8am unless you have permission from your case manager to be in beyond that time.
18. Turn in all objects that can be used as a weapon, including, but not limited to: Leathermans, scissors, hammers, utility knives, etc. If you are unsure ask staff.
19. Toiletries including alcohol must be turned into staff (e.g. - mouthwash, OTC medications that contain alcohol, rubbing alcohol).
20. Turn in all prescription medications to staff (except asthmatic inhalers or heart medication). You may have access to it any time you need it.
21. Store all personal belongings in accordance with the posted Transitional Dorm Storage Regulations.
22. Belongings left in the long-term storage for over 30 days after you leave the shelter will be considered abandoned and will be discarded.
23. While in the TP, relationships (social or otherwise) outside of the shelter between clients and staff/case managers are not permitted.
24. A current TB card showing negative test results must be presented to staff upon entering the Transition Program.
25. Transition Program clients are not allowed to get a pet while they are in the program.

_____                    _____
Client signature                                  Case Manager signature

Revised- 12/20/10



### BOULDER SHELTER *for the* HOMELESS

*Welcome to the Boulder Shelter.   We ask that everyone who stays here read, sign, and agree to the following:*

## BOULDER SHELTER CONDITIONS OF STAY

1.  I will treat all staff, volunteers, residents and the Shelter with respect and dignity.

2.  I will not bring alcohol or illegal drugs in the building, or consume them on the property.

3.  I agree to turn in any prescription medications when I enter the building.

4.  I agree to turn in any tools and potential weapons when I enter the building.

5.  I agree to resolve conflict without resorting to threats or violence.

6.  I will not open doors for anyone outside the Shelter.

7.  I will take all of my belongings when I leave the Shelter unless they are secured in a locker.

8.  I agree to enter and exit the Shelter at scheduled times.

9.  I will not engage in intimate physical contact with anyone at the Shelter.

10. I agree to breathalyze if requested by staff.

11. I agree to get tested for tuberculosis (TB) within 14 days of my first night of stay.

12. I agree to follow staff directions and decisions.

**I understand that I can be asked to leave if I don't follow the Shelter rules.**

Printed Name _____   Date __4-24-11__

Signature _____

*By signing this contract you agree to abide by all Conditions of Stay*

Jeffery Thomas Allens

Nightly Stay History at the Boulder Shelter for the Homeless

13-CV-01475

# Boulder Homeless Shelter
09/08/2011, 04:12 pm

## Resident Profile Report
Page: 1 of 2

| | | |
|---|---|---|
| **Resident Name:** | Allen, Jeff (10915) | |
| **Gender:** | Male | |

☐ From Colorado
☐ From Boulder County

**Origin:** Omaha, Nebraska

**Status:** Emergency
**Race:** Caucasian

☐ Contract Bed?
☐ Admit Sober Only?

**Date First Stay:** 04/24/2011
**Date Last Stay:** 06/07/2011
**Barred Start Date:** 06/08/2011
**Barred Return Date:** 06/22/2011
**Date of Birth:** 06/26/1966

| Stay Date | Bed# | Chore# | Notes |
|---|---|---|---|
| 06/01/2011 | MD021 | | |
| 06/02/2011 | MD021 | | |
| 06/03/2011 | MD021 | | |
| 06/04/2011 | MD021 | | |
| 06/05/2011 | MD021 | | |
| 06/06/2011 | MD021 | | |
| 06/07/2011 | MD021 | | |
| 05/01/2011 | MD001 | | |
| 05/02/2011 | MD001 | | |
| 05/03/2011 | MD001 | | |
| 05/04/2011 | MD001 | | |
| 05/05/2011 | MD001 | | |
| 05/06/2011 | MD001 | | |
| 05/07/2011 | MD001 | | |
| 05/08/2011 | MD001 | | |
| 05/09/2011 | MD001 | | |
| 05/10/2011 | MD001 | | |
| 05/11/2011 | MD001 | | |
| 05/12/2011 | MD001 | | |
| 05/13/2011 | MD001 | | |
| 05/14/2011 | MD021 | | |
| 05/15/2011 | MD021 | | |
| 05/16/2011 | MD021 | | |
| 05/17/2011 | MD021 | | |
| 05/18/2011 | MD021 | | |
| 05/19/2011 | MD021 | | |
| 05/20/2011 | MD021 | | |
| 05/21/2011 | MD021 | | |
| 05/22/2011 | MD021 | | |
| 05/23/2011 | MD021 | | |
| 05/24/2011 | MD021 | | |
| 05/25/2011 | MD021 | | |
| 05/26/2011 | MD021 | | |
| 05/27/2011 | MD021 | | |
| 05/28/2011 | MD021 | | |
| 05/29/2011 | MD021 | | |
| 05/30/2011 | MD021 | | |
| 05/31/2011 | MD021 | | |
| 04/24/2011 | MD001 | | |
| 04/25/2011 | MD001 | | |

# Boulder Homeless Shelter

09/08/2011, 04:12 pm

## Resident Profile Report

Page: 2 of 2

**Resident Name:** **Allen, Jeff** (10915)      **Status:** **Emergency**      **Date First Stay:** **04/24/2011**

| Stay Date | Bed# | Chore# | Notes |
|-----------|------|--------|-------|
| 04/26/2011 | MD001 | | |
| 04/27/2011 | MD001 | | |
| 04/28/2011 | MD001 | | |
| 04/29/2011 | MD001 | | |
| 04/30/2011 | MD001 | | |

**\* Total Stays = 45**

MAJOR WEAPON

13-CV-01475



On multiple occasions Mr. Allen has requested to see the Boulder Shelter for the Homeless rules on Practice , Policy and Procedure .

On multiple occasions Mr. Allen recieved no answer .

Finally , Mr. Allen was told by Mr. Tim Schaaf [Lead Case Manager for the Boulder Shelter for the Homeless] that Mr. Allen could not see it and there was nowhere that Mr. Allen could go to obtain a copy of it .

Mr. Tim Schaaf holds no liscence of any kind to do the work He does . He counsels Pedophiles , Felony Sexual Offenders , Felons in general , some violent .

I think there is something wrong with that .

06 - 11 - 2013

1

MAJOR WEAPON POLICY

of the

BOULDER SHELTER for the HOMELESS

*13-CV-01475*

Boulder Shelter for the Homeless

Consequence Guidelines

## MAJOR WEAPONS

**14 nights out**
- Voluntarily turned in a major weapon after intake (first time only).

**90 nights out**
- Failed to turn in a major weapon immediately after entry (involuntary turn-in or staff found the weapon).
- Voluntarily turned in a major weapon after intake (second time).
- Used an object (chair, mop, coffee mug, etc.) as a weapon – no injury occurred (see also 'violence').

\* A warning may be given if a resident voluntarily or involuntarily turned in a major weapon after intake, and only if staff is <u>absolutely certain</u> the resident was not informed of the weapons policy. **THIS IS A RARE EXCEPTION TO BE USED WITH DISCRETION**

'Major' weapons may include: all straight razors (inc. box cutters or utility knives), pocketknives, large/full-size scissors, large/heavy tools (hammers, long chisels, long screwdrivers, large wrenches, large ratchet sets, large drills and drill bits, large and heavy flashlights (Maglites), bolt cutters, saws, etc), and baseball bats. Generally larger and intimidating weapons or tools.

\* After 2 weapons violations, staff may decide that the resident should be brought up at the Tuesday meeting for group discussion and/or further consequences.

\* The Shelter will not allow firearms, ammunition, or firearm replicas anywhere on the property.

Non-weapons: nail clippers with file, blunt-nosed scissors (child's scissors/safety scissors), sewing needles, sports equipment (except baseball bats), umbrellas, and electric hair clippers/shavers. Flammable liquids are considered a hazard and should not be stored anywhere on the property.

Mr. Allens background check

13- CV-01475



**COLORADO
DEPARTMENT
OF PUBLIC SAFETY**

TO: BOULDER SHELTER FOR THE HOMELESS

RE: ALLEN, JEFFERY THOMAS       DOB: 062666   SOC: XXXXX5318

No Colorado Record of arrest has been located based on information provided.

The Colorado Bureau of Investigation's database contains detailed
information of arrest records based upon fingerprints provided by
Colorado law enforcement agencies. Arrests, which are not supported by
fingerprints, will not be included in this database. On occasion the
Colorado criminal history will contain disposition information provided
by the Colorado Judicial system. Additionally, warrant information,
sealed records, and juvenile records are not available to the public.

*The results are based on a name search which may
or may not be the subject of this inquiry. This search does not
include a fingerprint comparison, which is the only means of
positive identification.* Since an arrest record may be established after
this inquiry, an arrest record is only valid at the time of the current request.
To ensure the most current available information in regards to subsequent
arrest after an initial inquiry, it is recommended another query be made.

Falsifying or altering this document with the intent to misrepresent
the contents of the record is prohibited by law, and may be punishable
as a felony when done with intent to injure or defraud any person.

Sincerely,
Ronald C. Sloan, Director
Colorado Bureau of Investigation

Date: 10/04/12  03:30:00(MT)

John W. Hickenlooper
GOVERNOR

James H. Davis
EXECUTIVE DIRECTOR

Colorado State
Patrol

Colorado Bureau
of Investigation

Division of
Criminal Justice

Office of Preparedness,
Security, and Fire Safety



Denver Office
690 Kipling Street, Suite 3000
Denver, Colorado 80215-5825
(303) 239-4300
Admin. FAX (303) 235-0568
Invest. FAX (303) 239-5788
cbi.denver@cdps.state.co.us

Pueblo Office
3416 North Elizabeth Street
Pueblo, Colorado 81008
(719) 542-1133
FAX (719) 542-6411
cbi.pueblo@cdps.state.co.us

Grand Junction Office
2797 Justice Drive
Grand Junction, Colorado 81506
(970) 248-7500
FAX (970) 248-7464
cbi.grandjunction@cdps.state.co.us

Durango Office
160 Rock Point Drive, Unit B
Durango, Colorado 81301
(970) 375-1646
FAX (970) 375-1619
cbi.durango@cdps.state.co.us

MR. ALLENS 2011 S.S.D.I.AWARD LETTER

13 - CV- 01475

\*\*\*  REC 2013030  124053 HCB741E0 AYQX  CIPQYAB    PQAB   (F-AYQ )  \*\*\*

1099   DTE:01/30/13  SSN: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          DOC:882 UNIT:SER     PG: 001

```
        ++++FORM SSA-1099 - SOCIAL SECURITY BENEFIT STATEMENT - 2011++++
    +PART OF YOUR SOCIAL SECURITY BENEFITS MAY BE TAXABLE INCOME FOR 2011.
    +USE $ 12510.00 FROM BOX 5 BELOW WITH IRS NOTICE 703 TO SEE IF ANY PART
     OF YOUR BENEFITS MAY BE TAXABLE ON YOUR FEDERAL INCOME TAX RETURN.
    +ALSO SEE ATTACHED GENERAL INFORMATION.
```

BOX 1. NAME-JEFFERY THOMAS ALLEN
BOX 2. BENEFICIARY SOCIAL SECURITY NUMBER-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 (SEE BOX 8 BELOW)
BOX 3. BENEFITS FOR 2011- $ 12510.00 (SEE DESCRIPTION OF AMOUNT IN BOX 3 BELOW)
BOX 4. BENEFITS REPAID TO SSA IN 2011-NONE
           (SEE DESCRIPTION OF AMOUNT IN BOX 4 BELOW)
BOX 5. NET BENEFITS (BOX 3 MINUS BOX 4) FOR 2011-$ 12510.00
BOX 6. VOLUNTARY FEDERAL INCOME TAX WITHHELD-NONE
BOX 7. ADDRESS-JEFFERY ALLEN              2301 LAWRENCE
              NO 47                       DENVER CO 80205-2126
BOX 8. CLAIM NUMBER-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A  (USE THIS NUMBER IF YOU NEED TO CONTACT SSA)

+++DESCRIPTION OF AMOUNT IN BOX 3+++
ADD:
PAID BY CHECK OR DIRECT DEPOSIT---------------------------------$ 11352.00
MEDICARE PART B------------------------------------------------$  1158.00
MEDICARE PART C------------------------------------------------$     0.00
MEDICARE PART D------------------------------------------------$     0.00
WORKERS COMPENSATION OFFSET-----------------------------------$     0.00
DEDUCTIONS FOR WORK OR OTHER ADJUSTMENTS----------------------$     0.00
PAID TO ANOTHER FAMILY MEMBER---------------------------------$     0.00
ATTORNEY FEES------------------------------------------------$     0.00
VOLUNTARY FEDERAL INCOME TAX WITHHELD-------------------------$     0.00
BENEFIT PAYMENT OFFSET - TREASURY----------------------------$     0.00
                                     TOTAL ADDITIONS-$ 12510.00

SUBTRACT:
NONTAXABLE PAYMENTS------------------------------------------$     0.00
AMOUNTS FOR OTHER FAMILY MEMBERS PAID TO YOU-----------------$     0.00
                                   TOTAL SUBTRACTIONS-$     0.00
              BENEFITS FOR 2011 (AMOUNT SHOWN IN BOX 3)-$ 12510.00

+++DESCRIPTION OF AMOUNT IN BOX 4+++
ADD:
CHECKS RETURNED TO SSA---------------------------------------$     0.00
DEDUCTIONS FOR WORK OR OTHER ADJUSTMENTS---------------------$     0.00
OTHER REPAYMENTS---------------------------------------------$     0.00
            BENEFITS REPAID TO SSA IN 2011 (AMOUNT SHOWN IN BOX 4)-$     0.00
```

DENVER CO
SSA FO 882

JAN 30 2013

1500 Champa St. Ste. 200
Denver. CO 80202

| SOCIAL SECURITY ADMINISTRATION | TOE 250 | OMB No.0960-0024 |
|---|---|---|

## PHYSICIAN'S/MEDICAL OFFICER'S STATEMENT OF PATIENT'S CAPABILITY TO MANAGE BENEFITS

**Paperwork Reduction Act Statement** - This information collection meets the requirements of 44 U.S.C. § 3507, as amended by Section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 10 minutes to read the instructions, gather the facts, and answer the questions. **SEND THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. To find the nearest office, call 1-800-772-1213.** *Send only comments on our time estimate above to: SSA, 6401 Security Boulevard, Baltimore, MD 21235-6401.*

In replying, use this address:
SOCIAL SECURITY ADMINISTRATION
13151 W ALAMEDA PKWY
LAKEWOOD, CO 80228

DR RONALD HARRIS
2955 S BROADWAY
ENGLEWOOD, CO 80113

TELEPHONE NUMBER (Including Area Code)
(866) 206-7656

DATE
03/19/2009

SSA CONTACT

**Privacy Act:** This report is authorized by sections 205(a) and 205(l) of the Social Security Act, as amended (42 U.S.C. 405(a) and 405(l). While you are not required to respond, your cooperation will help us decide whether any Social Security benefits that may be due should be paid directly to the patient or to someone else on the patient's behalf. Your cooperation in completing and returning this statement will be appreciated.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it. Explanations about these and other reasons why information you provide may be used or given out are available in Social Security Offices. If you want to learn more about this, contact any Social Security Office.

NOE

IDENTIFYING INFORMATION (SSA Only)
If different from patient

NAME OF WAGE EARNER OR SELF-EMPLOYED PERSON

SOCIAL SECURITY NUMBER
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

| PATIENT'S NAME JEFFREY T ALLEN | PATIENT'S ADDRESS (Number and Street, City, State, and ZIP Code) 6804 W CORNELL, DENVER CO 80227 |
|---|---|
| PATIENT'S SOCIAL SECURITY NUMBER 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 | PATIENT'S DATE OF BIRTH 06/26/1966 |

## YOUR HELP IS NEEDED

The patient shown above has filed for or is receiving Social Security or Supplemental Security Income payments. We need you to complete the back of this form and return it to us in the enclosed envelope to help us decide if we should pay this person directly or if he or she needs a representative payee to handle the funds. **Please Note:** This determination affects how benefits are paid and has no bearing on disability determinations; **SSA will NOT pay for this Information.** Thank you for your help.

## WHO IS A REPRESENTATIVE PAYEE

A representative payee is someone who manages the patient's money to make sure the patient's needs are met. The payee has a strong and continuing interest in the patient's well-being and is usually a family member or close friend.

## WHO NEEDS A REPRESENTATIVE PAYEE

Some individuals age 18 and older who have mental or physical impairments are not capable of handling their funds or directing others how to handle them to meet their basic needs, so we select a representative payee to receive their payments. Examples of impairments which may cause incapability are senility, severe brain damage or chronic schizophrenia. However, even though a person may need some assistance with such things as bill paying, etc., does not necessarily mean he/she cannot make decisions concerning basic needs and is incapable of managing his/her own money.

## PLEASE COMPLETE THE INFORMATION ON THE REVERSE OF THIS FORM

1. Date you last examined the patient    4/1/09

2. Do you believe the patient is capable of managing or directing the management of benefits in his or her own best interest?

By capable we mean that the patient:

- Is able to understand and act on the ordinary affairs of life, such as providing for own adequate food, housing, clothing, etc., and

- Is able, in spite of physical impairments, to manage funds or direct others how to manage them.

☑ Yes                    ☐ No                        ☐ Unsure

If "Yes", please omit        If "No", please provide a brief summary      If "unsure",
question 3, but be sure to    of the findings that led to this conclusion.   please explain.
sign and date the form.       Also, complete question 3.

3. Do you expect the patient to be able to manage funds in the future (for example, the patient is temporarily unconscious)?

☑ Yes                    ☐ No

If yes, please explain.

| NAME OF PHYSICIAN/MEDICAL OFFICER (Please print.) | TITLE |
| --- | --- |
| RONALD R. HARRIS, M.D. | INT. MED. |

| ADDRESS (Number and street, City, State, and ZIP Code) | TELEPHONE NUMBER (Include Area Code) |
| --- | --- |
| 2955 S. BROADWAY, ENGLEWOOD, CO. 80110 | (303) 378-4545 |

I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge. I understand that anyone who knowingly gives a false or misleading statement about a material fact in this information, or causes someone else to do so, commits a crime and may be sent to prison, or may face other penalties, or both.

| SIGNATURE OF PHYSICIAN/ MEDICAL OFFICER | DATE |
| --- | --- |
|  | 4/1/09 |

Form SSA-787 (11-2002)  ef (6-2005)

## INCIDENT AND ONSET OF DISABILITY

On the night of May 31st early morning of June 1st 1984 Mr. Jeffery Thomas Allen was involved in a single Vehicle rollover accident at the Intersection of County Road 92 and County Road 29 approximately 1 mile South of Valley Nebraska .

Mr. Allen was on County Road 29 an unlit roadway traveling the speed limit when He came upon an unmarked 400 ft. radius left hand curve .

The curve could not be negotiated at 55 miles an hour , the curve sign and the speed advisory plate were down and had been so for several months . It was an unfamiliar stretch of road to Mr. Allen and Mr. Allens Vehicle left the pavement approximately 320 ft into the curve .

the Vehicle rolled and flipped 7 times before coming to rest near the shoulder of County Road 92 , a several hundred foot distance .

Mr. Allen was partially ejected from the Vehicle on what is believed to be the onset of the first flip . But His feet being entangled in first the

1

13-CV-01475

pedals then the steering wheel trapped Mr. Allen in the window of the Vehicle .

Mr. Allen rolled with the Vehicle trapped in the window 5 times before being completely ejected from the Vehicle and thrown the distance of approximately 150 feet .

Luckily Mr. Allen was not alone . He had a passenger who had been completely ejected on the first flip .

Upon regaining conciousness after being slammed to the pavement Mr. Allens passenger entered the accident scene and began to look for Mr. Allen .

After some time of not being able to locate Mr. Allen the passenger began to call out Mr. Allens name .

Mr. Allen responded . He was quite some distance away face down in a drainage ditch .

The passenger located Mr. Allen . All of Mr. Allens clothes had been torn off aside from His underwear and one sock . Mr. Allen was trying to talk but functionally could not . The passenger took notice that Mr. Allens head was out of the water and then tried to explain to Mr. Allen that He was going to go and find help .

Some time passed before Brian John Hanson finally made His way to a farm house He had seen in the distance due to its yard light . There He found assisstance .

Brian John Hanson was made to stay at the farm house due to His

2

own serious injuries . The Man at the house left to find Mr. Allen . The Woman called the Valley Rescue Squad .

The Man at the House failed to locate Mr. Allen due to the thick growth of underbrush and weeds . He knew that Mr. Allen was in the drainage ditch but there was alot of drainage ditch and it was all overgrown .

Mr. Allen could no longer verbally respond to the Mans calls as He searched .

The first Emergency Responder at the scene was Douglas County Deputy Sheriff Jackson .

Deputy Sheriff Jackson with the use of His floodlights located Mr. Allen .

Deputy Sheriff Jackson sent the Man from the House to the beginning of the curve to warn the Paramedics of the curve ahead and the fact that the sign was down .

Deputy Sheriff Jackson taking care to move Him as little as possible began to administer emergency first aid to Jeffery Thomas Allen in the mud of the drainage ditch .

Mr. Allen was transported to Methodist Hospital in Omaha Nebraska reported as having a less than 10% chance of survival . The Radio transmission stating that Victims guts and brains were hanging out .

Upon arrival Mr. Allen had become very Vocal , very uncooperative , and as animated as Injuries would allow , Mr. Allen had to be restrained

3

so His injuries could be treated .

Mr. Allen , along with the scores of other injuries He suffered , was also found to have a traumatic closed Head injury to His left Temporal Lobe , and an open wound , knifing type injury to the right posterior of His Skull .

Mr. Allens Brain Tissue was evident on the surface of His skull .

Alcohol was not a contributing factor in the accident .

Speed was not a contributing factor in the accident .

No tickets were issued to Mr. Allen .

Based entirely on speculation Mr. Allen surely must have been doing something wrong .

They never did find Mr. Allens shoes .

JEFFERY THOMAS ALLEN

06-11-2013

4





# Exempla Good Samaritan Medical Center
## Medical Imaging Department
## 200 Exempla Circle
## Lafayette, CO  80026
## 303-689-4110

| | | | |
|---|---|---|---|
| **Name:  ALLEN, JEFFERY** | **MRN:** S0219626 | **DOB:** 6/26/66 | **Pt. Status:**  O |
| **Exam:** (GSM) CTHBWO - CT HEAD WO CONTRAST | | **Date/Time Completed:** 03/24/2012 2:05 PM MDT | |

**History (reason for exam):**

CT HEAD WO CONTRAST 3/24/2012 2:05:00 PM

INDICATION: DYSARTHRIA AND LEFT UPPER EXTREMITY WEAKNESS FOR MONTHS

COMPARISON: None

TECHNIQUE: Noncontrasted images of the head.

FINDINGS: The right occipital craniectomy and large right cerebellar resection and gliosis. No mass effect.

No fracture, bleed, visible acute infarct, hydrocephalus, or extra-axial collection.

No hyperdense vessel to suggest thrombosis. No discrete mass, but limited evaluation without contrast.

Mastoids, middle ears, and partially imaged sinuses are clear. Foramen magnum is patent.

IMPRESSION:
1. RIGHT POSTERIOR FOSSA SURGERY. CORRELATE CLINICALLY.
2. NO ACUTE ABNORMALITY SEEN. MRI IF CONCERN FOR ACUTE INFARCT NOT SEEN ON THIS EXAM.

Slot: 80

Thank you for this referral. This exam was interpreted by a fellowship trained neuroradiologist. If the patient's healthcare provider has any questions, a Diversified neuroradiologist can be reached directly at 1-855-400-6386 any time.

As Jeffery Thomas Allen was trying to pursue His rights and gain Justice in this situation He had contacted the Colorado Department of Regulatory Agencies , Civil Rights Division .

The Boulder Shelter came back at one point and said they were not aware of Jeffery Thomas Allens disability that "He had been given the oppurtunity to denote mental illness on many occasions but chose not to do so".

Jeffery Thomas Allen is on disablity for an Organically Anatomical Brain Injury and the effects and detrimonts that injury has on Mr. Allens everyday life .

It is quite reasonable to say that Mr. Allen did not denote Mental Illness because there was no Mental Illness .

On another occasion the Boulder Shelter for the Homeless stated to DORA  that they had the right to determine disability . and they just didnt feel that Mr. Allen was disabled .

Mr. Allen will have the transcipt of His Disability hearing upon His day in court .

I would like to know what Educational level the People at the Boulder Shelter have reached and what liscences and certifications they hold to allow them to make a determination on someones disability .

Mr. Allen will also produce the original Neuro-Surgeons report from Dr. Leslie C. Hellbucsh at Methodist Hospital in Omaha Nebraska upon His day in Court .

Department of Regulatory Agencies ruled against Mr. Allen .

It seems because the Shelter "says" they didnt do anything wrong they must not

1

have .


JEFFERY THOMAS ALLEN

06-11-2013

CONTACT NUMBERS AS OF SEPTEMBER 10TH 2011

13- CV-01475

## Direct Dial Phone Numbers, Extensions & General Information

| Administration | | | Office # | DOH |
|---|---|---|---|---|
| Greg Harms | Executive Director | x101 | 303.468.4311 | 9/19/2002 |
| Travis Railey | Development Director | x102 | 303.468.4312 | 9/3/2004 |
| Kelli Murphy | Grants | | 303.468.4315 | 9/18/2006 |
| Catherine Bedell | Donor Relations and Events Mgr. | x108 | 303.468.4310 | 11/1/2009 |
| Michelle Byrne | Database Coordinator | x107 | 303.468.4314 | 3/23/2004 |
| Wayne Agraz | Controller | x103 | 303.468.4315 | 8/15/2006 |
| Gina Barajas | Volunteer Program Manager | x105 | 303.468.4316 | 8/27/2007 |
| **Case Management** | | | | |
| Tim | Lead Case Manager | x111 | 303.468.4321 | 9/27/2000 |
| Val | Case Manager/Prog. Supv. | x114 | 303.468.4322 | 9/8/2004 |
| Beka | Case Manager | x113 | 303.468.4320 | 10/20/2008 |
| Liz | Case Manager | x112 | 303.468.4319 | 7/22/2009 |
| **Housing First Program - bchousingfirst@hotmail.com** | | | | |
| Janet W R | Housing First Coordinator | x148 | 720.839.5865 | 6/1/2007 |
| Chris B | Housing First Case Manager | x145 | 303.453.9031 | 3/23/2004 |
| Michael B | Housing First Case Manager | x144 | 303.327.7120 | 8/29/2007 |
| **Facilities** | | | | |
| Mike R | Director of Facilities | x115 | 303.468.4323 | 1/1/1994 |
| Ray (Dismissed 7/6/11) | | | 303-468-4315 | 5/27/2008 |
| Alex | Kitchen Manager | x125 | 303.468.4325 | 9/13/2007 |
| **Program Management** | | | | |
| Rene Brodeur | Director of Programs/Trans. Housing Dir. | x106 | 303.468.4318 | 9/11/2002 |
| Andrea | Asst. Director of Programs | x104 | 303.468.4317 | 9/27/2004 |
| Chris G | Supervisor | x109 | 303.468.4326 | 12/8/2008 |
| Chad | Logistics Lead | x119 | 303.468.4329 | 9/28/2009 |
| Janet | Facilities Lead | x119 | 303.468.4329 | 3/6/2001 |
| Brenna | Boulder County Cares Manager | x122 | 303.468.4328 | 11/7/2005 |
| Stephen | Boulder County Cares Assistant | x122 | 303.468.4328 | 1/26/2010 |
| Karen | Womens Group Coordinator | x157 | 303.468.4315 | 1/10/1993 |
| Margaret | Shelter Trans. Housing | x143 | 303.327.7122 | 2/10/2006 |

| Program Staff | Phone Number | |
|---|---|---|
| Jack (Resigned 7/16/11) | 303-468-4315 | 5/29/2008 |
| Jasmine | 303-468-4315 | 8/18/2010 |
| Josh | 303-468-4315 | 9/10/2009 |
| Karyn | 303-468-4315 | 8/29/2008 |
| Lindsay | 303-468-4315 | 12/7/2009 |
| Lyndall | 303-468-4315 | 9/28/2009 |
| Meagan | 303-468-4315 | 6/6/2011 |
| Natalie | 303-468-4315 | 9/15/2008 |
| Rob | 303-468-4315 | 9/15/2008 |
| Robbie | 303-468-4315 | 10/24/2007 |
| Sam | 303-468-4315 | 10/4/2010 |
| Sarah C | 303-468-4315 | 12/8/2008 |
| Sarah H | 303-468-4315 | 9/15/2010 |
| Sawyer | 303-468-4315 | 6/6/2011 |

Mailing address: 4869 North Broadway, Boulder, CO 80304